Sampath K. HEMMIGE,
Plaintiff-Appellant, and
Cross-Appellee,

v.

CHICAGO PUBLIC SCHOOLS, et al.,
Defendants-Appellees, and
Cross-Appellants.

Nos. 83–1443, 83–1548.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1985.
Decided March 10, 1986.

---

Kathern MacKinnon, Northwestern Univ. Leg. Clinic, Chicago, Ill., for plaintiff-appellant, and cross-appellee.

Maria Campo, Chicago Board of Educ. Legal Dept., Chicago, Ill., for defendants-appellees, and cross-appellants.

Before CUDAHY, POSNER, Circuit Judges, and BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

In this civil rights action Sampath K. Hemmige, a school teacher, appeals from the judgment and order of the district court dismissing his employment discrimination claims against the Chicago Public School system which were brought under the provisions of 42 U.S.C. Sec. 2000e and 42 U.S.C. Sec. 1983. The defendants, members of the Board of Education of the City of Chicago, and various employees of the board, appeal a judgment in favor of Hemmige which awarded him $570.41 as damages for unpaid teaching hours.

Hemmige, an East Indian Hindu, was employed as a non-tenured, day-to-day substitute teacher in the Chicago Public Schools from the fall of 1977 through July, 1980, pursuant to temporary teaching certificates which were issued upon a yearly basis. His application for a temporary certificate for the 1980–1981 school year was denied in July, 1980, upon a finding that his teaching performance had been unsatisfactory. Hemmige contends that his teaching certificate was not renewed because of discrimination against his national origin and religion, and in retaliation for filing a complaint with the Equal Employment Opportunity Commission (EEOC). He also claims that he was denied procedural due process because he was not given a hearing on the decision not to renew his certificate.

Since an issue has been raised with respect to the appropriate scope of the judicial proceedings below, we first discuss in some detail the background of this case.

While Hemmige has been a teacher for more than thirty years, most of his teach-

---

* The Honorable Wesley E. Brown, Senior District Judge of the United States District Court for the District of Kansas, is sitting by designation.

ing experience has been in India, Ethiopia and Canada. He has two Masters Degrees—one in English Literature, and the other in Education, and he is qualified as an expert in teaching English as a second language. In June, 1977, he moved to Chicago, Illinois and applied for a temporary teacher's certificate with the Board of Education for the City. He was granted a certificate for the 1977–1978 school year, and was employed as a day-to-day substitute teacher. This was a non-tenured position whereby Hemmige was "on-call" on a daily basis as the need for substitute teachers might dictate. The temporary certificate expired by its own terms on August 31, at the end of each academic year, and in June, 1978, Hemmige reapplied for a certificate for the 1978–1979 school year. In a letter dated July 28, 1978, he was advised that a certificate was being denied due to an unsatisfactory teaching report.[1]

On August 31, 1978, Hemmige filed a discrimination charge with the Illinois Fair Employment Practices Commission, claiming that he had been discriminated against because of his East Indian national origin.[2] The school board subsequently issued a certificate for the 1978–1979 school year, and again, a certificate for the 1979–1980 school year. On June 13, 1980, Hemmige filed a charge of religious and national origin discrimination by defendants with the Equal Employment Opportunity Commission. In this charge Hemmige made the following allegations:

"I have been employed by the Chicago Board of Education as a Substitute Teacher since September 1979. (sic) On June 11, 1980 while working at the above named facility (Montefiore High School) I was called a poor Hindu, Indian, told to get out, pushed, and not allowed to sign out by Daniel G. Griffin, Principal. The Board of Education employs more than 15 people.

"I was called names, pushed and told to leave without being allowed to sign out by Mr. Griffin because I had gone to the restroom. The Board of Education's contract with the Chicago Teachers Union Sections 6–17, 17–2 and 25–1 allow teachers to have a lunch period and a free period during the day. Teachers are not required to work more than 6 periods a day. There are at least five (5) minutes between classes for breaks.

"I believe that I have been discriminated against because of my national origin, East Indian, in that: I was not allowed to take a break during the day. After he learned that I had taken a break during class, Mr. Griffin pushed me and yelled, 'poor Hindu, Indian get the hell out and go to your country. I won't let you sign out.' He also called the police. Officer Ramao ... asked Mr. Griffin to allow me to sign out. Mr. Griffin refused and at 2:20 p.m. I left the building.

"Mr. Griffin refused to allow me to sign out. He told me I would not be paid for the day."

While this charge was pending, Hemmige applied for a temporary certificate for the 1980–1981 school year. In a letter dated July 18, 1980, Hemmige was informed by the Board that it would not renew his

1. Under date of December 15, 1977, the principal of one Chicago School wrote to the substitute teacher division advising that Hemmige, in his judgment was "unsatisfactory." "He refused to take an assignment to teach a class because he said he would not take more than five classes. This was an emergency since we were short of substitutes."

"If he is not terminated, we certainly do not wish him sent here again." (Ex. 24)

Under date of March 6, 1978, a principal from a second high school reported that Hemmige was reluctant to accept assignments offered to him and requested that he not be sent to that school again. (Ex. 27)

On June 12, 1978, a third principal reported that Hemmige became upset and created a scene in refusing to take an assigned class. This principal believed that Hemmige's "actions and behavior were unprofessional" and he requested that Hemmige not be sent to that high school as a substitute in the future. (Ex. 26)

2. In this discrimination charge Hemmige claimed that he had not received any oral or written reports regarding his teaching performance from principals; that no principal had ever observed him in a classroom teaching assignment, and that "Dr. Ellenbogen has stated to me that 'You are an Indian so I have terminated you.'" (Ex. 67)

teaching certificate, citing seven unsatisfactory reports from various Chicago public schools.

After receiving a right to sue letter, Hemmige filed a *pro se* complaint in this action. He there complained of discrimination in race, color, sex, religion, and national origin, claiming that he had been ill treated in every respect. After counsel was appointed, a four count amended petition was filed, which claimed that defendants discriminated against him on the basis of national origin and Hindu religion, retaliated against him for filing the EEOC charge, denied due process by deciding not to renew the certificate, without prior notice or opportunity to be heard, and that the defendants had breached his contract by failing to pay him for all of his work.

On February 10, 1982, the District Court granted defendant's motion to dismiss charges of alleged discrimination occurring prior to August 19, 1979 because they were not timely filed. The court noted that an incident which occurred at Moses Montefiore School on June 11, 1980, was the subject matter of the EEOC charge filed by Hemmige on June 13, 1980. The scope of the amended complaint, however, covered alleged discrimination from September, 1977 to September, 1980, and in addition, included a charge of retaliation for filing the 1980 charge. In determining the appropriate scope of the amended complaint, as it related to the EEOC charge, the trial court recognized that the scope of the judicial complaint is not limited to the precise facts set out in the EEOC charge—but rather "to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." See *Jenkins v. Blue Cross Mut. Hospital Ins., Inc.*, 538 F.2d 164, 167 (7 Cir.1976), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598, citing the standard applied in *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5 Cir.1971):

> "The correct rule to follow in construing EEOC charges for purposes of delineating the proper scope of a subsequent judicial inquiry is that 'the complaint in the civil action * * * may properly encompass any * * * discrimination like or reasonably related to the allegations of the charge and growing out of such allegations * * * *.'" (Citing *King v. Georgia Power Co.*, 295 F.Supp. 943, 947 (N.D.Ga.1968)).

The trial court found that the allegations of Count II of the amended petition, which related to a pattern of discrimination by defendant against minorities, vastly exceeded any investigation which could reasonably be expected to grow out of the charge of discrimination relating to the events at Montefiore High School on June 11, 1980. Accordingly, Count II was dismissed in its entirety.

Count I of the petition concerned several incidents of conduct which preceded the incident of June 11, 1980. The court found that any alleged acts which occurred before August 19, 1979 (300 days before the EEOC charge was filed) were untimely under Section 706(e) of Title VII, 42 U.S.C. Sec. 2000e–5(e), which provides that:

> "... (I)n a case of unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceeding under the State or local law, whichever is earlier...."

See *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).

The retaliation claim was allowed to stand since the permissible scope of a judicial complaint includes any new acts occurring during the pendency of the charge before the EEOC.

Plaintiff contends that the allegations in Count I establish a "continuing violation" theory of discrimination and that the district court erred in dismissing allegations which concerned incidents occurring prior

to August 19, 1979. In *Stewart v. CPC International Inc.*, 679 F.2d 117, 120 (7th Cir.1982), this Circuit determined that a plaintiff can charge a continuing violation when the employer has engaged in a practice of discrimination, usually involving hiring or promotion practices, where it is difficult to fix the exact day a particular violation may have occurred, or where an employer has covertly followed a practice of discrimination. However, in *Stewart* we recognized that a finding of continuing discrimination must be based upon a *present* violation, within the relevant time period. In our discussion of *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) we noted that:

"... the Supreme Court's emphasis upon the need to show a present violation of Title VII indicates that an employer may be held liable for a continuing practice of discrimination *if* the plaintiff can demonstrate that the practice has actually continued into the 'present'—that is, into the time period relevant to the date the charge of discrimination was filed. At least one discriminatory act must have occurred within the charge-filing period. Discriminatory acts that occurred prior to this period constitute relevant evidence of a continuing practice, and may help to demonstrate the employer's discriminatory intent; and they will of course be used to determine the extent of the remedy that is in order.... But the prior discriminatory acts do not come into play at all unless the plaintiff can show in the first place that the discrimination is 'presently' continuing." (679 F.2d at 121.) (Emphasis of the court)

Because we find that plaintiff failed to establish any incident of a "present" discrimination, there was no basis for consideration of the theory of "continuing discrimination."

After our review of the transcripts and record, we agree with the trial court's finding that the evidence in this case overwhelmingly establishes that plaintiff's teaching certificate was not renewed because of his own failure as a substitute teacher, and not because of his national origin or religion, or because of any other discriminatory bias. In this connection, the court below made certain credibility determinations which were adverse to Hemmige's position. For instance, plaintiff claimed that on June 11, 1980, Mr. Daniel G. Griffin, the Principal of Moses Montefiore School, called him "an ugly, poor old Indian," and ordered him to leave the school without justification, all because of Griffin's bias and prejudice against him. In giving evidence to the court, Mr. Griffin specifically denied calling plaintiff a name, or pushing him. Griffin testified that he ordered plaintiff to leave the school because he had left his class alone for an extended period of time, he used a telephone in a secretary's office, instead of being in the washroom, as claimed, and that he was evicted from the premises only after plaintiff created a scene, indicating that he would not obey Mr. Griffin. In the face of this conflicting evidence, the trial court discredited plaintiff's testimony, finding that Mr. Griffin was the one worthy of belief, and that his letter of June 11, 1980, was fully justified.[3]

Other incidents reflected plaintiff's inability to work with students. In December, 1979, an altercation occurred in a girls' chorus class which Hemmige was conducting at Roosevelt High School. The principal, Ursula Blitzner, reported the incident in this manner:

" * * * *

The student claimed that the teacher (Hemmige) requested her to change her seat three times. She moved twice

---

**3.** This letter, directed to the Substitute Teacher Center, was as follows:

"Please do not send substitute teacher Sampath K. Hemmige ... to Montefiore in the future.

Today he left his class unattended and could not be found for a considerable period

of time. He was finally discovered in a counselor's office using a school telephone.

I told him at that time (1:15 p.m.) to sign out and that he would only be credited with a half day. He refused to sign out.

I called Sub-Center with the above information." (Ex. 37)

and balked the third time. The student alleged that the teacher pushed her out of the chair, and she fell to the floor.

The teacher claimed that he requested the student to move several times because she was disruptive, and he alleged that he did not in any way touch her or the chair.

"The mother of the student came to school. A conference was held with the teacher, student, parent, and principal. The same impasse was reached at the conference. The student was checked by the matron at the time of the alleged incident and reported no bruises." (Ex. 31)

In March, 1980, Ms. Blitzner again found it necessary to report plaintiff's behavior to the Director of Teacher Personnel: (Ex. 32)

"Mr. Sampath K. Hemmige ... was a substitute at Roosevelt High School on Friday, March 21, 1980. His ability to work with high school students is extremely limited; his method of classroom management is to order the students to leave the class and not return.

"I returned the students to his class during the morning session with the directions for our procedures for handling student discipline. During the afternoon session, he again ordered students out of his class. They alleged that he also used derogatory language.

"In addition, he insisted that he was not going to cover a class that I asked him to cover, because he was 'overworked and paid a mere pittance by the Board of Education, and that he needed the period to rest.' I persisted, and he did cover the class.

"Since this is the second incident that I have reported to your office about Mr. Hemmige, I request that he not be sent to Roosevelt High School at all."

After reviewing the evidence the trial court resolved credibility questions in favor of Ms. Blitzner's testimony concerning incidents at Roosevelt High School and found that her actions and reports were not inspired in any way by plaintiff's national origin or ethnic attributes, but rather by his conduct as a substitute teacher.

Plaintiff also testified about an event which occurred at DuSable High School on May 21, 1980 when he allegedly was required to attend a "Gospel Choir," and where the Principal, Judith Steinhagen, allegedly expressed a preference for a Jewish substitute. Although there was no contrary testimony, the trial court chose to discredit plaintiff's testimony because he did not believe that plaintiff had testified truthfully as to a number of other material matters. In this respect, it was noted that plaintiff had testified in a manner "wholly contrary" to Ms. Steinhagen's report dated May 21, 1980, received in evidence as Exhibit 34:

"Mr. Sampath Hemmige was a substitute teacher at our school today. All students were assigned to report to a music assembly beginning at 9:42 seated by division teachers. Mr. Hemmige brought a chair in from the lunchroom and sat blocking the fire aisle. When questioned he told me that he had no division—he did and had the program card showing same. He then sat in an auditorium seat but refused to remove the chair after several requests. Within two minutes after the musical presentation began—our reknown (sic) Gospel Choir—he left the auditorium.

"I followed him out and repeatedly explained his responsibility for supervision of his class. He refused to do so. I then told him that if he refused to discharge his duties he was released from DuSable.

"He refused to leave and loudly and publicly in the main office challenged my competency to be in charge of this, or any school and called me a prejudiced dictator. He further stated that he was present and supervising for the entire assembly. This is not true.

"I do not want him sent to DuSable and sincerely believe that some serious investigation should be made before he is given a temporary certificate for 1980–1981. He is unsatisfactory."

Pursuant to school board policy,[4] a conference concerning the unsatisfactory report of Ms. Steinhagen was held with plaintiff on June 13, 1980. After he was given a copy of the report, he denied all charges, stating that the principal was a racist and had referred to him as an "Indian." The conference report (Ex. 35) further related that:

"Mr. Hemmige contends that the principal requested that he perform duties which he feels are not in line with his position as a teacher. He was advised of Board Rule 6–13—Duties of Teachers.

"Mr. Hemmige was made aware of the role of the principal and his role as a teacher. He was advised to be circumspect in his relationship with principals.

"Mr. Hemmige was reminded that another unsatisfactory letter could cause his termination."

As previously noted the unsatisfactory report from the DuSable principal was followed by another unsatisfactory report from Mr. Griffin, under date of June 11, 1980. On June 25, 1980 a conference was held with plaintiff regarding this letter, where he was again informed that while serving in a school as a day-to-day substitute teacher, he was under the jurisdiction of the local school principal.[5]

■ Our lengthy review of the evidence which was before the trial court fully supports the finding that plaintiff was not a competent substitute teacher and this was why the Board did not renew his license. Likewise, the evidence did not support, "in any degree," plaintiff's claim of unlawful discrimination, or retaliation against him because he had filed an EEOC charge.

■ Plaintiff contends that he possessed a property interest in his teaching certificate which was protected by the Fourteenth Amendment, and that he was deprived of his right to due process because the Board refused to renew his certificate without notice or an opportunity for hearing. Here, it is clear that plaintiff was a non-tenured, temporarily employed teacher. Under Illinois law, only tenured teachers are entitled to notice and hearing pending dismissal, and plaintiff's expectation of employment was governed by his one-year temporary certificate. The union contract provided that the services of an unsatisfactory temporarily certificated teacher could not be terminated "until he has been given an unsatisfactory rating by at least two principals."[6] There were no agreements between plaintiff and the Board that his temporary teaching certificates would be issued on a continuing basis. Each certificate was limited to a one year term, and was not subject to automatic renewal. Under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and our decisions in *McElearney v. University of Illinois*, 612 F.2d 285 (7th Cir.1979); *Smith v. Board of Education*, 708 F.2d 258 (7th Cir.1983); and *Eichman v. Indiana State University Board of Trustees*, 597 F.2d 1104 (7th Cir.1979) plaintiff had no property interest in a temporary teaching certificate. Contrary to the situation found in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), there was no evidence that the Board's rules or poli-

4. Under the provisions of the Chicago Teachers Union contract in force for September, 1979 through August 1981, which governed plaintiff's rights under a temporary teaching certificate, Section 39–4.3 provided that:

"When a temporarily certified teacher employed on a day-to-day basis receives an unsatisfactory rating, the Department of Personnel shall schedule a conference with such teacher to give him a written copy of the reasons and give him positive suggestions for improvement.

"The services with the school system of an unsatisfactory temporarily certificated teacher employed on a day-to-day basis shall not be terminated until he has been given an unsatisfactory rating by at least two principals, unless there is evidence of moral laxity or serious misconduct." (Tr. Vol. 1, p. 16)

5. During plaintiff's teaching appointments in Chicago, unsatisfactory reports were received from seven different schools. Conferences were held with him in January, 1978, February, 1979, and on the two occasions discussed in 1980.

6. Here, of course, plaintiff's employment was not "terminated," while his 1979–1980 certificate was in force.

cies had fostered any expectation of continued employment. Likewise, our recent decision in *Vail v. Board of Education,* 706 F.2d 1435 (7th Cir.1984) *affirmed* by equally divided court, 466 U.S. 377, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984) may be distinguished, for there, the plaintiff had a two year employment promise.

The district court found that plaintiff was entitled to payment for overtime in the sum of $570.41. The ruling in this regard was preceded by this comment:

"Some of the testimony from the past or Board employees which I credited does support the conclusion that the plaintiff is wrong when he said he taught extra classes at the end of the school day. Some of the evidence suggests that there were no classes to be taught at the end of the day. Therefore, precluding the opportunity for the plaintiff to teach at that time.

"In any event, I am going to find in favor of the plaintiff and award him overtime pay of $570.41 that he says he has coming. The plaintiff, at least, has some documentary evidence in support of that figure. It is not, in relative terms, a large amount and it is simply unworthy of a legal or judicial analysis on a day-to-day basis in order to reach some greater precision."

We have reviewed the trial transcript and exhibits received in evidence in this case. The only evidence to support the award of overtime is plaintiff's self serving testimony and Exhibit 84, a "diary" of notes made by Hemmige concerning teaching assignments, travel notes, and other comments.[7] The diary was written in the Hindi language and abbreviated English. Plaintiff testified that he marked his "overtime days" in this diary with an asterisk, although no times of arrival or departure are indicated. Plaintiff testified that his claim for overtime was based upon being asked to work extra classes, above his "normal load." In this respect he claimed

that the union contract governing overtime pay for substitute teachers provided for payment of $42.00 per day for a 6-hour day, and $50 per day for an 8-hour day, with certain increments after 100 days of service. (Ex. 56, p. 126) Hemmige claimed that he was not allowed to eat lunch at the Montefiore School, but the evidence shows that this was a closed campus and no teacher had a free lunch hour during the school day, which ended at 2:30. Teachers were then free to eat lunch or go home at that time. A similar situation existed at the Anderson School.[8] In some instances, plaintiff claimed that he had to work after school hours until 4:30 p.m. but the testimony of principals was to the contrary— there were no classes lasting until 4:30, and plaintiff was not asked to take any extra classes at the end of the school day. Under the union contract a principal was allowed to assign teachers extra classes in emergency situations, and the first persons called upon for this service were the substitute teachers.

■ While the trial court found that plaintiff at least had "some" evidence on his overtime claim, there was no finding that such evidence was credible. The record is in fact to the contrary. The court did not "believe that the plaintiff has testified truthfully as to a number of material matters," and found that plaintiff refused to take classes when he had an obligation to do so. Plaintiff had the burden of proof in establishing his breach of contract claim, and in our view he failed to offer sufficient credible evidence to support a finding that he was entitled to $570.41 in overtime pay.

The judgment entered in favor of all defendants and against the plaintiff on all claims of discrimination and retaliation is AFFIRMED. The judgment awarding plaintiff the sum of $570.41 on the issue of overtime pay is REVERSED.

7. Other Exhibits purportedly summarized material in this diary, *e.g.,* Exs. 71, 75, 76, 77 and 80.

8. While teachers had no "free" lunch period they could eat with the students during the student lunch hour if they preferred.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

I do not believe that the district court committed clear error in awarding the plaintiff $570.41 for alleged overtime work. On this point I would respectfully dissent and would simply affirm the judgment.