Gloria M. DUGAN, Plaintiff-Appellant,

v.

BALL STATE UNIVERSITY, et al.,
Defendants-Appellees.

No. 86–1139.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1986.

Decided April 6, 1987.

Ivan E. Bodensteiner, Valparaiso, Ind., for plaintiff-appellant.

Scott E. Shockley, DeFur, Voran, Hanley, Radcliff & Reed, Muncie, Ill., for defendants-appellees.

Before BAUER, Chief Judge,
POSNER, Circuit Judge, and
ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

·Gloria M. Dugan, an assistant professor at Ball State University, brought this ac-

tion against the university, alleging sex discrimination under Title VII of the Civil Rights Act of 1964, § 701 et seq., codified as amended, 42 U.S.C. 2000e et seq. and under 42 U.S.C. § 1983. She claimed discrimination in the denial of a promotion to associate professor, in the denial of a salary increase, and in the payment of a lower salary than a similarly situated male professor. The district court granted summary judgment to defendants on all counts. We have jurisdiction under 28 U.S.C. § 1291. We will affirm.

## I.

Dugan began at the Department of Mathematical Sciences (the "Mathematics Department") at Ball State as a temporary faculty member in 1968. She retained that status until 1971, working under one-year employment contracts with the university. In the fall of 1971, she became an assistant professor, a "regular," tenure-track faculty member. She attained tenure in 1973 and has remained at Ball State.

During the academic year 1979–1980, Dugan applied for a promotion to associate professor. The Mathematics Department denied her application on the basis that Dugan was ineligible for the position because she did not have a doctorate degree or fit the requirements of an "equivalency." An equivalency, according to the *Faculty Handbook*, which sets out university policies and rules, describes conditions under which "other educational experiences and/or professional experiences are as appropriate as formal academic work." An equivalency is initiated by a department. The handbook names several committees that must approve an equivalency before a faculty member may be promoted under it.

Dugan had applied under the "Higgins equivalency." In 1976, Higgins, a long-time member of the Mathematics Department, was terminally ill. Several members of the department, including Dugan, proposed an equivalency that would make it possible for him to become a full professor. It required "full-time employment in the Mathematical Sciences Department of Ball State University prior to October 1, 1951 [Higgins joined Ball State in 1951], and twenty-five (25) years of loyal service to the profession." The equivalency, although not approved by the necessary committees, remained on file as part of the "Promotion and Tenure Guidelines for the Department of Mathematical Sciences." In that document, however, the date "1951," is rendered "1971." The seven is typed somewhat above the line and in a different typeface than the rest of the document. Dugan conceded in the court below that the date was originally 1951. Higgins was recommended for promotion by the department but died before the recommendation was acted upon.

Dugan followed the complete course of appeals available: review by committees of faculty members at the department, college, and university levels; by the president of the university; and finally by the Board of Trustees (the "Board"). Each affirmed the denial of her application for promotion, the Trustees acting on March 26, 1982. That autumn, Dugan wrote to Michael Gemignani, Dean of the College of Sciences and Humanities. Gemignani replied in a letter dated October 11, 1982, that without a doctorate, Dugan could not advance to associate professor.

In 1983, Ball State gave certain faculty members raises in pay from a "salary retention fund." The idea was that if the university increased the stipends of the more "marketable" members of its faculty, they would be less likely to be enticed elsewhere. An initial group of awards was made without the use of any published criteria or formal application process. This evidently caused a measure of discontent among the faculty. Subsequently, an application process was formulated and criteria for the awards were announced:

(1) the individual's expertise is in a high demand area;

(2) the individual has credentials that make him/her highly marketable; and,

(3) there are documentable current salary inequities relating to any individuals who meet the first two tests.

Faculty members were to apply to their respective chairperson, who was to make recommendations to the college dean, who would cull from those recommendations the applications that he would pass on to the provost.

Dugan applied for a retention fund increase. The chairman of the Mathematics Department endorsed her application. Dean Gemignani responded in his decision letter that he would not recommend her further because he did not "believe that the documentation provided presents a clear case that she is significantly underpaid as compared with others in academia with similar rank and credentials."

Dugan filed a charge against Ball State with the EEOC on July 13, 1983. As amended, it alleged sex discrimination in violation of Title VII in the denial of a promotion, in the denial of a salary increase, and in the payment of a salary less than that of a similarly situated male faculty member.

Dugan filed her complaint in the Southern District of Indiana on February 12, 1985, alleging sex discrimination in violation of Title VII and Section 1983. She also charged several causes of action based on the same events that are not on appeal: sex discrimination in violation of Title IX, a due process claim under Section 1983, and state contract claims.

The trial court granted summary judgment to Ball State on all counts. It held that the claims regarding the denial of promotion were time-barred. The Title VII claim was barred because Dugan failed to file a charge with the EEOC within 300 days of the Board's affirmance of the promotion denial. The 1983 claim was barred by the statute of limitations. The court, applying *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), retroactively, held that Indiana's two-year period for personal injury claims applied. The court also held that even if the claims were not time-barred, Ball State would be entitled to judgment as a matter of law. The court similarly held on the merits that Ball State was entitled to judgment on the claims of sex discrimination regarding the denial of a salary increase and lower pay than a similarly situated male faculty member. Dugan appeals each of these holdings. The court also granted Ball State summary judgment on the Title IX, due process and state contract counts; Dugan does not appeal from these last-mentioned decisions.

## II.

▮ The trial court ruled that Dugan's Title VII claim relating to the promotion denial was untimely because she failed to file her charge with the EEOC within 300 days of the Board's affirmance of the decisions below. The Title VII claims regarding the denial of a salary increase and less pay than a similarly situated male were timely. Dugan argues that the time should be measured from the subsequent letter to her from Dean Gemignani advising her that she could not be promoted to associate professor without a doctorate. She thus claims that his denial was a continuing violation of her rights.

The Supreme Court has held that the limitations period runs from when an employee is notified of an adverse employment decision. *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Thus, although the decision has subsequent adverse effects, the time is measured not from when the employee is affected, but from when the employee learns of the discriminatory acts. In *Ricks*, a faculty member alleged discrimination in the denial of tenure, a decision which at Delaware State College inevitably lead to his termination. The Court held that the limitations period ran not from when he was terminated but from when he was notified of the decision to deny him tenure. In *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), a stewardess was discriminatorily fired; the airline later rehired her but refused to reinstate her seniority. Again, the time ran from the decision to fire her; once that was done, the implementation of the decision in another employment action was not a separate discriminatory act. *See*

*also Hemmige v. Chicago Public Schools,* 786 F.2d 280 (7th Cir.1986).

Because Dugan did not make her submission to Gemignani part of the record, we can only infer its content from his response to her. He wrote that he had perused the material that she sent him and had to conclude that she could not be promoted without a doctorate. He complimented her presentation to the Board. He expressed his sympathy with her "understandable disappointment at the lack of promotion" and suggested that she take pride in her other achievements.

Gemignani clearly relied on the Board's decision in informing Dugan that she did not meet the requirements for an associate professor. She had already made every appeal available. The decision process was over; the university had unambiguously informed her of its decision. Dugan evidently wrote to Gemignani to make her case once again. But the fact that an employee continues to argue an employment decision does not make the decision any less final, particularly here where the final decision has been made by the governing board of the university and the employee appeals to a subordinate official. Any other holding would mean that a plaintiff could always resuscitate a stale claim by asking for reconsideration.

Dugan seeks to avoid *Ricks* by characterizing her submission to Gemignani as a new application for promotion. She argues that faculty members at Ball State are entitled to reapply each year for promotion and thus that Gemignani's letter constituted a separate denial. This contention is specious. As Dugan agreed below, recommendations for promotion are initiated by department. Thus, an application for promotion would not be directed to the dean of the college but to the appropriate official within the Mathematics Department. Nothing in the record suggests that either Dugan or Gemignani viewed her submission as beginning the application process

again. For example, she did not "appeal" his "decision."

### III.

■ The trial court also held that Dugan's claim under section 1983 relating to the denial of promotion was timebarred. The court, applying *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), held that the applicable statute of limitations was Indiana's two-year limit for tort actions for personal injury. *Wilson* was decided after the complaint was filed in this case; the court applied *Wilson* retroactively. In *Wilson,* the Supreme Court responded to the widespread confusion and conflict among federal and state courts about the correct statute of limitations to apply in section 1983 actions by holding that courts should apply the state limit for claims for personal injury. At the time of the district court's ruling, this court had not decided the question whether *Wilson* was to be applied retroactively in Indiana.

Subsequent to oral argument in this case, this court held that an "Indiana 'plaintiff whose section 1983 cause of action accrued before the *Wilson* decision, April 17, 1985, must file suit within the shorter period of either five years from the date his action accrued or two years after *Wilson.*'" *Loy v. Clamme,* 804 F.2d 405, 408 (7th Cir.1986), quoting *Anton v. Lehpamer,* 787 F.2d 1141, 1146 (7th Cir.1986) (*Anton* held that *Wilson* was not to be applied retroactively in Illinois). Thus, we hold that Dugan's section 1983 claim regarding the denial of promotion was not time-barred. As discussed below, however, we will affirm the trial court's ruling in the alternative against Dugan on the merits.

### IV.

The trial court did consider all Dugan's claims of discrimination on the merits and found each wanting. In analyzing claims of intentional discrimination[1] in employ-

---

1. Dugan has proceeded in this case only on a disparate treatment theory, not a disparate impact theory. We note also that because her Title VII claim regarding the denial of promotion

was untimely, there remains only the section 1983 claim on that count. A section 1983 equal protection violation requires a showing of intentional discrimination, thus foreclosing a dispar-

ment decisions under both section 1983 and Title VII, we employ the familiar templet from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Dugan must first establish a prima facie case. She can do so in regard to either of the two challenged employment decisions, the denial of a promotion and of a salary increase, by demonstrating:

1. She is a member of a protected group, women;
2. Ball State sought applicants for the benefit in question, she applied, and she was qualified;
3. Ball State rejected her application;
4. Ball State continued to offer the benefit in question to qualified applicants.

If Dugan establishes a prima facie case, the burden shifts to Ball State to give a legitimate, nondiscriminatory reason for the rejection. Dugan can respond by showing that the proffered reason is but a pretext, an excuse for discrimination.

### A. Denial of Promotion

■ The dispute here centers on whether Dugan was qualified for promotion to associate professor. Summary judgment is appropriate where the record does not show that plaintiff was qualified. *Mason v. Pierce*, 774 F.2d 825 (7th Cir.1985). Dugan first argues that there is a genuine issue of material fact as to whether she qualified under the Higgins equivalency. In her verified statement of genuine issues in the court below, Dugan conceded that she and other faculty members initiated the Higgins equivalency as a special gesture for the terminally ill professor and that the equivalency originally required service at Ball State before October 1, 1951, not 1971. She evidently contends that the fact that the document setting out the equivalency was unexplainedly altered since then makes it a fair basis for a promotion now. The fact that it is unclear how the modification occurred does not raise an issue about its validity, where Dugan suggests no theo-

ry under which the modification was legitimate. Even if we assumed that a genuine issue of fact was raised whether she was technically qualified, the refusal of the university officials to apply such a questionable equivalency would qualify as a legitimate, nondiscriminatory reason for denying her promotion. *Cf. Merwine v. Board of Trustees for State Institutions of Higher Learning*, 754 F.2d 631, 637 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 76, 88 L.Ed.2d 62 (1985). As evidence that the refusal to apply the equivalency in her case was motivated by her gender, Dugan's brief also contends that two male professors in the Mathematics Department were recommended for promotion, "apparently under this equivalency," in 1969 and 1970. Implied in this contention is a clear prochronism, for the parties agree that the equivalency was not proposed until 1976. These contentions are of little weight in showing that her denial of promotion was sex discrimination.

Dugan next attacks the university's requirement of an equivalency as itself a pretext for discrimination. Dugan alleges that at Ball State seventeen males have been promoted to associate professor and then to full professor on the basis of equivalencies, while only two women have been promoted to associate professor with an equivalency. If a plaintiff shows that a requirement for a job was indeed only a cover used to legitimize discrimination, then the requirement would not be a "qualification" required to establish a prima facie case. If Ball State arbitrarily required all applicants to be male, courts would not require a litigant suing Ball State to establish being male as part of the prima facie case. But, because the single statistic offered has several flaws, Dugan's offering is insufficient to raise a question of fact whether the equivalency requirement was employed in her case as a pretext for discrimination.

Most significant is that the statistic is for the university at large, rather than for the

ate impact claim. *American Nurses' Association v. State of Illinois*, 783 F.2d 716, 722 (7th Cir. 1986).

Mathematics Department. The Second Circuit found university-wide statistics insufficient to withstand a summary judgment motion in a discriminatory treatment case where tenure decisions were made by individual departments. *Zahorik v. Cornell University*, 729 F.2d 85, 95 (2d Cir.1984) ("[T]enure decisions at Cornell are not made by a single authority but are highly decentralized. Gross statistics are thus meaningless absent a departmental breakdown."); *see also Molthan v. Temple University*, 778 F.2d 955, 963 (3rd Cir.1985) ("Because the considerations affecting promotion decisions may differ greatly from one department to another, statistical evidence of a general underrepresentation of women in the position of full professor adds little to a disparate treatment claim."). Like the tenure and promotion decisions in those cases, individual departments make recommendations for promotion at Ball State. Thus the most important data would be data regarding the individual department. Equivalencies are also formulated at the department level. Different fields of expertise might be more likely to use equivalencies. Among musicians, for example, the line between academics and performers might not be as clear as in more scientific disciplines. It might be more acceptable in certain fields than others for a professor to have a degree other than a doctorate.

The strength of Dugan's offering is further diluted by its incompleteness. She alleges merely that seventeen of nineteen professors promoted under equivalencies were men. There is no indication of how many women and men attempted to gain promotion using an equivalency and failed. Thus the statistic cannot show that a woman was less likely to receive the benefit of an equivalency. This is aggravated by the further failing that Dugan does not specify the times at which the promotions using equivalencies were made. The only two assigned times were two men in the mathematics department, in 1969 and 1970, almost a decade before Dugan's denial. Although Dugan offers that twenty-seven per cent of the faculty was female in 1979, there is no information about the gender make-up of the faculty in 1969, 1970, or any other time beside 1979. Such information is necessary to determine whether the statistic indicates that she was the victim of discrimination in 1979.

These two types of incompleteness worsen the problem of failing to give statistics by department. It is impossible to extrapolate from that single statistic the conclusion that women were less likely to receive the benefit of an equivalency, far less the conclusion that the requirement of an equivalency was really a pretext for discrimination.

### B. Denial of Salary Increase

■ That Dugan did not meet the published criteria for a grant from the salary retention fund is clearly a legitimate, nondiscriminatory reason for the university to have denied her request. We analyze it as such, rather than as part of the prima facie case, because a number of awards were made before the criteria were announced; thus there exists a question whether meeting those criteria was a qualification for an award. Dugan contends that she did submit "market-oriented data, including information from the *Wall Street Journal* and *Focus Magazine.*" She does not contend that this data demonstrated that she met the criteria. Nor did she make the submitted articles part of the record in the district court. The district court found that she submitted nothing to show that she was significantly underpaid. We find no reason to believe that the denial of her application was not justified.

Dugan next attacks that proffered reason as a pretext. Again, Dugan submits statistics meant to show that the university treated men more favorably in awards from the salary retention funds. She contends that twenty-seven per cent of the Ball State faculty members are female and women received eight per cent of the funds. This statistic suffers from deficiencies similar to those discussed above.

Once more, Dugan submits university-wide statistics. Here, her request was denied at the college, not the department level. But the need for more refined statis-

tics is clear. The first of the criteria required that the applicant's expertise be in a high demand area. The purpose of the fund was to use salary raises to keep faculty members from being hired away by higher bidders. In some disciplines the market forces pulling faculty members away would be stronger. There might be a higher demand on the part of industry for experts in physics than in metaphysics.

Dugan's university-wide statistic also omits important information. No mention is made of how many men and women applied for grants and how many were refused. It is true that some of the grants were made before applications were solicited, but Dugan also fails to separate her numbers along these lines. The omission exacerbates the failure to give more refined information; more grants might have been made in areas where men were overrepresented. *Cf. Craik v. Minnesota State University Board*, 731 F.2d 465, 480 (8th Cir.1984) (market factor increases granted to seventeen men and one woman justified by greater market demand in predominantly male disciplines). For example, it does appear from some incomplete information in the record that many grants were given to males in computer science and in accounting. But there is no information about the gender make-up of those departments.

Dugan does not support her statistical argument with anecdotal evidence of discrimination. She does assert that men were more likely to receive grants because the higher-level university officials who made the selections were male. Such rank speculation lends her case no support.

Ball State did submit statistics showing that within Dugan's college, the College of Sciences and Humanities, women accounted for 13.8% of the applicants for retention fund increases. Men received eighteen awards and women two awards. Had the awards been strictly proportional, men would have received 17.24 awards and women 2.76 awards. This deviation is too small to indicate that there was discrimination. In the Mathematics Department, four faculty members applied, three males and one female, and one male received a grant. Neither side offers information about the gender make-up as a whole of the college or the department. The two sides' statistics taken together raise no question of fact whether Dugan's denial for failure to meet the published criteria was a pretext for gender discrimination.

### C. Unequal Pay

Dugan compares her salary with the salary of an associate professor, Duane Deal. Deal had been promoted from special assistant professor to associate professor on the basis of a valid equivalency. Because Dugan failed to show discrimination in the denial of her application for promotion to associate professor, a comparison of her salary with Deal's tells little. We note also that Deal served at Ball State longer than Dugan, that he logged more credit hours toward a doctorate than Dugan, and that he was Chairman of the Mathematics Department for six years and Administrative Assistant to the Chairman for ten. That he receives an annual stipend four thousand dollars greater than Dugan's raises no inference of discriminatory treatment.

### V.

For the reasons stated, the district court's grant of summary judgment is

AFFIRMED.