Dema ARMSTRONG, Natalie Lyle, Doris Shelby and Mary Robinson,

v.

CHICAGO PARK DISTRICT, et al., Defendants.

No. 87 C 0833.

United States District Court, N.D. Illinois, E.D.

Aug. 12, 1988.

Rufus Cook, Barbara Revak, Cook Partners Law Offices Ltd., Chicago, Ill., for plaintiffs.

James D. Wascher, Supervising Asst. Atty. Gen., George F. Galland, Jr., Davis, Barnhill & Galland, P.C., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Dema Armstrong ("Armstrong"), Natalie Lyle ("Lyle"), Doris Shelby ("Shelby") and Mary Robinson ("Robinson") have sued the Chicago Park District ("District") and several past and present District employees and Commissioners,[1] alleging sex discrimination in District's employment practices in violation of both 42 U.S.C. § 2000e–5(f)(1)("Title VII") and 42 U.S.C. § 1983 ("Section 1983").[2] All defendants have now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, the motion is granted as to all four plaintiffs.

### Rule 56 Principles

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). When the nonmovant has the ultimate burden of proof on a particular fact, the party moving for summary judgment may simply point to the absence of evidence from which that fact may reasonably be inferred (*id.* 477 U.S. at 323, 106 S.Ct. at 2553). Then the nonmovant must come forward with *evidence* from which a factfinder could resolve the factual dispute in its favor. For that purpose a trial court draws every reasonable (although not every conceivable) inference in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

Rule 56(e) itself says (emphasis added):

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided by this rule, *must* set forth *specific facts* showing there is a genuine issue for trial.

Plaintiffs have studiously ignored that evidentiary burden. For example, the very first paragraph of their purported Statement of Material Facts As to Which There Is a Genuine Issue (the "General Rule 12(f) Statement"—more on General Rule 12(f) shortly) relies on allegations in the Amend-

---

1. Individual defendants comprise current Commissioners Walter Netsch, William Bartholomay, Margaret Burroughs, Rebecca Ann Sive and Sylvia Herrera; former Commissioners Jack McHugh, Sydney Marovitz and Iola McGowan; Executive Vice–President Jesse Madison; former Superintendent Edmund Kelly; former Superintendent of Employment Alton Neiman; and Acting Superintendent of Employment Leona Green.

2. This action was originally styled a class action on behalf of all female District employees. Plaintiffs' class certification motion was denied in the "Opinion," 117 F.R.D. 623 (1987).

ed Complaint (the "Complaint") to establish a dispute as to the crucial issue of intentional discrimination. Yet this Court clearly cannot treat the Complaint as raising a factual issue. Rule 56 says so explicitly.

Plaintiffs have proceeded with equal disregard for the related procedural rules of this District Court. This District Court's General Rule 12(e) requires every movant for summary judgment to file a statement of "material facts as to which the moving party contends there is no genuine issue." That statement is to take the form of "short numbered paragraphs, including with each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon." Defendants submitted just such a statement (their "General Rule 12(e) Statement") with their motion.

General Rule 12(f) then says:

**Motions for summary judgment; Opposing party.** Each party opposing a Rule 56 motion shall serve and file, together with opposing affidavits (if any) and other materials referred to in rule 56(e) and a supporting memorandum of law, a concise response to the movant's statement. That response shall contain (1) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (2) a statement, consisting of short numbered paragraphs, of any additional facts which the opposing party maintains warrants the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

While plaintiffs did submit what they labeled a General Rule 12(f) statement, it does none of the things required by that Rule. It does not respond to any (much less each) of the paragraphs in the General Rule 12(e) Statement. As already mentioned, when plaintiffs' counsel do try to raise a genuine issue, they often do so by reference to pleadings rather than evidence. Their paragraphs are not short statements of fact, but rather rambling and argumentative melanges of factual assertions and legal conclusions. Finally, rather than referring to specific evidence to establish factual disputes, plaintiffs' counsel repeatedly ask this Court to look through all the evidence and find the disputes for itself.[3]

If plaintiffs' counsel had given the matter any thought, they would have had to realize the very purpose of this District Court's adoption of General Rules 12(e) and 12(f) was to create an affirmative burden on the lawyers bringing and opposing summary judgment motions to eliminate that very possibility. To that end those Rules seek:

1. to force counsel to look closely at the evidence and the law to determine what material facts are really in dispute; and

2. to allow the court to assess at the threshold—and with the least waste effort—whether there is really a factual dispute and whether that dispute is material (that is, outcome-determinative).

Total noncompliance with those Rules, such as plaintiffs' counsel have shown, defeats both those goals. It is quite clear plaintiffs' counsel have not even attempted to determine what their clients would have to

---

**3.** To be sure, the General Rule 12(f) Statement does contain a few specific references to affidavits. But it is also replete with statements such as (¶ 3):

Reference should be made to the affidavits of Armstrong, Cho and Revak in their entirety for further examples of material facts as to which there is a genuine issue.

That is really egregious. On occasion a lawyer may be excused for asserting the existence of a specific factual dispute and, through oversight, omitting a reference to the evidence. There is no excuse, though, for dumping a pile of evidence on a judge's desk and saying, "We believe there is a genuine issue of fact. See if you can find it for us."

prove at trial. Indeed, they have yet to settle on a theory for their case.[4]

Of course General Rule 12(f) directs this Court on how to proceed: All material facts not controverted are deemed admitted. Under Rule 56(e) the issue then becomes whether, given the admitted facts, summary judgment is appropriate.

### Title VII and Section 1983

 Each plaintiff claims she was passed over for promotion because of her sex.[5] Intentional sex-based discrimination in promotion decisions ("disparate treatment") is actionable under both Title VII and Section 1983 (e.g., *Dugan v. Ball State University*, 815 F.2d 1132, 1135 n. 1 (7th Cir.1987)). Title VII also prohibits some "facially neutral employment practices that have significant adverse effects on protected *groups* ... without proof that the employer adopted those practices with a discriminatory intent" (*Watson v. Fort Worth Bank and Trust*, —— U.S. ——, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988) (emphasis in original)). That "disparate impact" theory of liability is not available under Section 1983, because only intentional discrimination violates the Equal Protection Clause (*American Nurses' Association v. Illinois*, 783 F.2d 716, 722 (7th Cir.1986)).[6]

P.Mem. 2 admits plaintiffs must prove defendants' discriminatory intent, which suggests plaintiffs are not advancing any Title VII disparate impact claim. Yet some of the evidence plaintiffs supply is of the statistical sort usually relied on in disparate impact cases. Similarly, plaintiffs sometimes argue along disparate impact lines—as when they assert that defendants' intentional reliance on a system of subjective evaluations, which results in a pattern of skewed promotions, establishes their claims. Because plaintiffs never really lay out their theory of the case and then point to the evidence supporting the various elements of that theory, it is extremely difficult to know just what they are claiming.

This Court has nonetheless concluded there is no disparate impact issue in this case for three reasons:

1. Plaintiffs never use that term or one of its synonyms to describe their claims.

2. They never identify "the specific employment practice" that causes any disparate impact, and doing so is a critical element of such claims (*Watson*, 108 S.Ct. at 2788, 2792–95).

3. Their discussion of statistical evidence seems more geared toward rebutting defendants' reliance on that sort of evidence than on making their own case.

In consequence, this opinion will look to what must be shown in disparate treatment terms.

 In a disparate treatment case, plaintiff must show the employer had a discriminatory intent. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) has defined, and a host of cases since then have employed, a scheme of shifting production-of-evidence burdens to channel that inquiry—beginning with whether plaintiff has established a "prima facie case." Here defendants say none of

---

4. This Court has no pretense of being prescient. It is, however, relevant to note that the reason that Opinion, 117 F.R.D. at 630–34 denied class certification as to both putative classes in this case was primarily because of the failure to show adequacy of representation under Rule 23(a)(4). And that failure was laid directly at the door of plaintiffs' counsel. Their demonstrated serious deficiencies in handling prior class litigation, and in the opening stages of this action, have found an echo in the treatment of the current motion. Fortunately the early denial of class certification by the Opinion has saved other prospective class members from any direct adverse effect as a result of counsel's current deficiencies.

5. Complaint ¶ 13e asserts two other discriminatory practices: (1) District's now-discontinued use of stereotypes to classify job titles by sex and (2) District's compensation of job titles held primarily by women at lower rates than those held primarily by men. Opinion, 117 F.R.D. at 625–26 & n. 4 and at 629 & n. 13 pointed out none of the plaintiffs makes any claim to have been harmed by either practice. Nothing in plaintiffs' current submissions suggests they are pursuing those claims.

6. Section 1983 also differs from Title VII in that it applies only to those acting under color of state law. All defendants clearly meet that description.

the plaintiffs has done so, and with the partial exception of Shelby they have not addressed the second and third stages of the *Burdine* burden-shifting process. This opinion will therefore focus primarily on whether any plaintiff can identify evidence sufficient to allow a factfinder to conclude she has a prima facie case of discrimination. Only in the case of Shelby will it be necessary to take a brief foray into the "legitimate reason" and "pretext for discrimination" steps.

*Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1307 (7th Cir.1985) has described the generic prima facie case as a showing that (1) plaintiff is a member of the protected class, (2) she is otherwise situated similarly to members of the unprotected class and (3) she was treated differently from those members of the unprotected class. When plaintiff challenges the employer's failure to promote her, *Dugan*, 815 F.2d at 1136 (adapted to this case) has refined that test to require these showings:

> 1. She is a member of a protected group, women;
>
> 2. [District] sought applicants for the benefit in question, she applied, and she was qualified;
>
> 3. [District] rejected her application; [and]
>
> 4. [District] continued to offer the benefit in question to qualified applicants.

That final element of the *Dugan* formulation does not state in terms that a female employee cannot establish a prima facie case if it develops that the promotion went to another female. *Riordan v. Kempiners*, 831 F.2d 690, 696 (7th Cir.1987) has later said:

> So when a woman establishes that a public employer refused to hire her and instead hired a male who was no more qualified, she makes out a prima facie case of sex discrimination under the equal protection clause as well as under Title VII, and the burden shifts to the employer to produce evidence that the

reason for treating the man and woman differently was not an invidious one.

But perhaps Judge Posner was simply describing there a sufficient, rather than a necessary, condition of the prima facie case. *Kirk v. Board of Education of Bremen Community High School District No. 228*, 811 F.2d 347, 354 n. 10 (7th Cir. 1987) had earlier described the final step of the prima facie case as a showing that "the position either remained open or was filled by a member of a non-minority group"— again a statement consistent with the notion that filling the position with a minority group member would *not* do the prima facie job, but not saying that in so many words.

If that were in issue here, this Court would seek the answer in the basic function of the prima facie case as articulated in *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94; to identify "circumstances which give rise to an inference of unlawful discrimination." As *Burdine, id.* at 254, 101 S.Ct. at 1094 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978)) put it:

> [T]he prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."

Such an inference or presumption may reasonably be drawn from an employer's rejection of a qualified woman while continuing to hold a position open, but it is very difficult to infer that an employer's rejection of one woman in favor of another was "more likely than not" because of the rejected woman's sex.[7]

This issue need not detain us further here. Each plaintiff has asserted she was passed over in favor of men and has attempted to prove just that. No harm will be done to plaintiffs' cause by requiring them to show what they have alleged.

---

**7.** This does not mean that a woman passed over for promotion in favor of another woman could never prove sex discrimination in the decision. Rather, she must have more evidence suggesting discrimination than just the employer's failure to promote her.

### District's Employment System [8]

At all times District's Department of Recreation has adhered strictly to a "lines of promotion" system in making promotions of its employees. Under that system promotions to fill vacancies are not ordinarily open to employees generally. Instead, a vacancy normally will be filled by selecting from the pool of employees in the next lower position on the line of promotion.

In the Department of Recreation's vast recreational instruction programs, the line of promotion includes the following positions in ascending order: (1) Monthly Physical Instructor, (2) Playground Supervisor, (3) Park Supervisor, (4) Physical Activities Supervisor and (5) Area Supervisor. In the Building & Facilities Operating Division, the line of promotion has only two positions: Monthly Attendant and Head Attendant. Promotions are considered on a District-wide basis, so employees are in the pool for promotions to vacancies in the next-higher position on the line of promotion regardless of which of District's many facilities has the vacancy.[9]

During the period in question here, District did not post job vacancies or otherwise seek applications for promotions. However, it did continue to promote employees through its lines of promotion system, and such promotions were not limited to those who applied. This Court will therefore not require a plaintiff to show she actually applied for the promotion in question, but rather only that a man received the promotion.

### Armstrong [10]

Armstrong holds a Bachelor of Science degree from North Carolina Central University and a Masters Degree from McCormick Theological Seminary. She began working for District in 1957 at Stateway Gardens Park. In 1967 she was transferred to Touhy–Herbert Park and promoted to Playground Supervisor, a position she held until April 1, 1986 when District made her Park Supervisor at Touhy–Herbert.[11] In 1981 she was one of only ten Playground Supervisors to receive District's "Gold Award" for excellent service.

Complaint ¶ 19 alleges Armstrong was repeatedly passed over for promotion to Park Supervisor in favor of males with less seniority and education and inferior efficiency evaluations. Defendants say, to the contrary, that Armstrong was offered promotions five times during the period between 1982 and 1986 and turned them all down. If that is not contested, her claim as stated clearly fails. After all, defendants can hardly be faulted for promoting someone less qualified than Armstrong if she had already turned them down.

Armstrong Aff. ¶ 6 says she was offered a transfer to Pulaski Park in May 1983 but that she was not offered a promotion, although her area supervisor "seemed to indicate that after the transfer I would have to serve a probationary period." Her contemporaneous memorandum on the conversation (Armstrong Aff.Ex.A) makes no mention of the probationary period but does say "I assumed, although this was not stated to me, that I would receive a promotion upon such transfer." Shortly after being offered the transfer/promotion [12] she

---

8. Except as indicated in n. 9, this section's opening paragraphs are taken almost verbatim from defendants' General Rule 12(e) Statement ¶¶ 2–5, all of which plaintiffs have admitted. Citations to evidence have therefore been omitted.

9. Defendants do not specifically assert this sentence's feature of the lines of promotion system as undisputed. However, that is clearly the way in which their system works.

10. All the following discussions of plaintiffs' claims conform to the Rule 56 principles stated earlier. Accordingly this opinion accepts as true plaintiffs' versions of events to the extent

their affidavits are based on personal knowledge.

11. That change came after she filed the EEOC charges that eventually resulted in this action.

12. Armstrong now says she was never offered a promotion, even though she clearly assumed she would be promoted after the customary probation period. But Kulovits Aff. ¶ 6 says Pulaski was traditionally supervised by a Park Supervisor, and that—rather than whether Armstrong knew rather than simply assumed it to be so—is the relevant fact. After all, a claim of disparate treatment depends on discriminatory intent. For that purpose, the intent at issue is

wrote the memorandum expressing dissatisfaction with District's offer,[13] and she shared the memorandum with her supervisor. She was neither promoted nor transferred to Pulaski.

In late September 1983 Armstrong was told she would be transferred to Ogden Park effective October 1.[14] She immediately wrote the Director of Recreation saying "I would be acceptable to the transfer, if I am promoted on the effective day of transfer, otherwise, I feel further clarification is needed ..." (Armstrong Aff.Ex.B). She closed the letter by neither accepting nor rejecting the offer. She was not promoted or transferred to Ogden.[15]

In mid–1984 Armstrong was offered a promotion to Park Supervisor at Stanton Park, which is located in the Cabrini Green Housing Project. She turned down the offer because (1) she would have had to serve a six-month probationary period,[16] (2) she was concerned about security at the park and (3) she had developed a successful program at Touhy–Herbert and thought it would be better for her to stay there (Armstrong Aff. ¶ 9).

At some time in 1983 or 1984 Armstrong was approached about a transfer to Lindbloom Park. She says she was never offered a promotion to Park Supervisor there,[17] but she did point out that unlike Touhy–Herbert, Lindbloom had no fieldhouse.

Finally, in September 1984 Armstrong was offered a transfer to LaFollette Park.[18] She turned that offer down because (1) she would have to serve a probationary period, (2) she felt she deserved to be a Park Supervisor at Touhy–Herbert

that of the employer making the employment offer, not that of the employee receiving it. Accordingly District must be viewed as having offered Armstrong a promotion, and it does not at all matter whether Armstrong's refusal to accept the transfer was based in part on her uncertainty about that.

13. Armstrong is black, and the offer to go to Pulaski (which is located in a white neighborhood) came on the eve of trial of a class action suit alleging race discrimination in District's promotion policies and in its provision of services to communities. Armstrong Aff.Ex.A says she was suspicious of the timing of the offer, but that she might accept if the recreational staff at Pulaski were integrated. Whatever her reasons, the inescapable import of Armstrong's memorandum is that she would not accept a position at Pulaski under the then-current conditions. And nothing she has tendered suggests the offer of the Pulaski position under those conditions implies sex-based animus on District's part.

14. Like Pulaski, Ogden has traditionally been assigned a Park Supervisor (Kulovits Aff. ¶ 6).

15. Given (1) District's general policy of requiring a probationary period (see n. 16), (2) Armstrong's express condition of *no* probation before she would take the job and (3) the short timetable District had for filling the position, District cannot be tagged with sex discrimination for having gone on to give the position to a male employee. After all, Armstrong *was* offered the position on identical terms first.

16. Armstrong Aff. ¶ 9 says District "repeatedly promoted males without requiring them to serve a probationary period." But to support that conclusion she points only to Revak Aff.Ex. J. That exhibit is a list of 27 individuals who are said to have received promotions during 1983 or 1984. All but one (a male) served probationary periods ranging from a few months to several years. Indeed, the two who served the longest probationary periods—66 and 112 months (!)—were men. District has tendered the May 13, 1983 Consent Decree in *United States v. Chicago Park District*, 82 C 7308 (N.D.Ill.) (a document of which this Court may take judicial notice), Paragraph 11 of which specifies a six-month probationary period for the positions to which Armstrong was offered promotions. It is an impermissible stretch from the evidentiary data Armstrong offers to her bald assertion—which is not in compliance with Rule 56(e)'s requirement of admissible evidence—that District "repeatedly" waived the probationary period for men. All she shows in proper evidentiary form is one such instance of total waiver out of 27 promotions. And if what is examined instead is the post-Consent-Decree promotions in which the full six-month requirement was waived by requiring less than a full-term probationary period, Revak Aff.Ex.J discloses just three such instances—one female and two males. However viewed, Armstrong's presentation suffers from lack of proof of sex-based discrimination.

17. Lindbloom had also traditionally been supervised by a Park Supervisor. As with Pulaski, that rather than Armstrong's present assertion of her belief is what controls.

18. It too had traditionally been assigned a Park Supervisor. Again that is the relevant fact on the disparate treatment issue.

and (3) she thought it would be best for her to remain at Touhy–Herbert where she had done a good job (see Armstrong Aff.Ex.C).

On that total factual scenario it must be concluded that any factfinder, taking all reasonable inferences in Armstrong's favor (as Rule 56 mandates), would have to find that District repeatedly offered her the position of Park Supervisor but that she turned those offers down for her own reasons.[19] With only one possible exception, those reasons cannot even arguably be characterized as probative of sex discrimination on District's part. And as to that one—Armstrong's unwillingness to consider serving a probationary period—what Armstrong's Aff. ¶ 9 says is this (emphasis in original):

> I was then and am now aware from my own personal knowledge and experience as a long term employee that a number of the DISTRICT's employees had been promoted *without serving* a six-month probationary period, a fact the accuracy of which was subsequently confirmed by one of my lawyers. (See Revak affidavit, Exhibit J). As I stated at page 72 of my deposition, notwithstanding the fact that I knew that the DISTRICT had repeatedly promoted males without requiring them to serve a probation period, I made clear that I would transfer to some of the parks on probation if I were given certain things such as security and a staff.

Rule 56(e) requires that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Armstrong's generalized hearsay statement, as summary and conclusory as it is, plainly does not meet that standard. What is before this Court in *evidentiary* terms, then, is only the Revak Affidavit discussed at n. 16. And that affidavit simply will not carry the probative impact Armstrong must assign to it.[20]

That leaves Armstrong with a failure to raise any factual issue as to the promotion offers made to her that is material in the outcome-determinative sense—that even with favorable inferences reflects a sex-based difference in the offers she received. And whether *she* did not view some of the transfer offers as accompanied by promotions, even if that were accepted for current purposes, has no bearing on the controlling fact that *District*'s intention was to offer the jobs as promotions to Park Supervisor.

In summary, Armstrong has fallen at the first hurdle of the *Burdine* formulation, as refined in such cases as *Dugan* : She has not created a material factual issue as to her not having been offered the desired promotion to Park Supervisor classification.[21] That means the final *Dugan* factor

---

19. Characterizing Armstrong's reasons as "her own" is not intended to be pejorative. Her reasons for wanting to stay at Touhy–Herbert may have been commendable and might even arguably be thought of as reflecting the best interests of park users (a matter not for this Court to decide). Perhaps it would be better for District to encourage strong relationships between District personnel and the community by rewarding employees who develop such relationships and by reducing the frequency of transfers (again a decision for District's management, not for this Court). Similarly, Armstrong's concern about security is legitimate. But once more her claim requires a showing of *sex* discrimination, not a showing that District's system-wide promotion policies are unwise or that it should have provided better security for its parks.

20. Though this may labor the point unduly, a single unexplained instance of a male employee

not required to serve a probationary period (for any one or more of what could be a host of reasons), in the context of a very large number of promotions that *were* conditioned on a probationary term—the very condition offered to Armstrong herself on several occasions—cannot reasonably create the inference that such condition was sex-discriminatory.

21. This analysis has treated Armstrong's claim as one of failure to promote her to Park Supervisor at all. To be sure, at times she seems to argue that she was discriminated against by District's failure to promote her to Park Supervisor *at Touhy–Herbert*. Had that been her claim, defendants would certainly have been entitled to summary judgment, for the *only* evidence that her classification at Touhy–Herbert was sex-based is that her predecessors there (all men) were classified as Park Supervisors. But her promotion to Playground Supervisor at Touhy–Herbert occurred in 1967, fifteen years

of showing that promotions went to less qualified men—a matter to which the parties devote a good deal of attention—is totally irrelevant. Once Armstrong turned down any particular promotion, District was not only entitled but required to go elsewhere. This opinion will therefore eschew any examination of how the reasonable inferences would come out on the issue of Armstrong's qualifications vis-a-vis those of men who were promoted.[22] Summary judgment is granted against Armstrong.

### Lyle

■ Lyle began working for District in 1945. By 1968 she had become a Physical Activities Supervisor. In 1971 District demoted Lyle to Park Supervisor.[23] She still holds that position.

Complaint ¶ 32 alleges "Lyle has been passed over for the position of Area Supervisor and beyond ... [while] less qualified males have been promoted."[24] To establish a prima facie case on that claim, Lyle must show she was qualified for the Area Supervisor position—which is two rungs above her on the "lines of promotion" ladder. Plaintiffs admitted the lines of promotion were rigidly adhered to during the

1982–87 period. Therefore Lyle was not qualified for the position which she says she was denied.[25]

Lyle cannot escape that conclusion by arguing she should have been restored to her old position of Physical Activities Supervisor and then promoted to Area Supervisor. To do so she would have to show sex-based discrimination in District's failure to take that first step, and that is a logical impossibility. District has ten Physical Activities Supervisors: five males (for boys' programs) and five females (for girls' programs). District maintains sex is a bona fide occupational qualification for the position, and Lyle does not dispute that. Because she was qualified only for the female slots and was not passed over in favor of a male to fill one of those slots, she has no claim of discrimination on that score.

Defendants have thus shown there is no disputed issue of material fact as to Lyle, and they are entitled to a judgment as a matter of law against her. She too must lose on the current motion.

### Shelby

■ Shelby began with District in 1967

---

outside any applicable limitations period (see App. n. 1). She has offered no evidence that men assigned to similar parks were upgraded. Indeed, she admitted there were no such men when she was silent in response to General Rule 12(e) Statement ¶ 10.

22. For purposes of that comparison, Armstrong points to Cho Aff.Ex.A, worksheets showing the paper qualifications of men promoted to Park Supervisor. Although that exhibit has become irrelevant to the resolution of Armstrong's claim, the fact that each plaintiff relies to some extent on Cho's worksheets warrants a brief discussion of their limitations. That has been done in the Appendix to this opinion.

23. Lyle maintains that demotion was unjust, but even if true that is irrelevant. She was demoted more than a decade before the beginning of the limitations period referred to in App. n. 1.

24. Opinion, 117 F.R.D. at 629–30 treated Lyle as charging a failure to promote her to Physical Activities Coordinator rather than Area Supervisor, a slight mischaracterization caused by the

sometimes inconsistent treatment of her claim contained in plaintiffs' memoranda on the class certification issue and in Lyle's deposition. That misreading of Complaint ¶ 32 did not affect the outcome on the class certification motion (id. at 630 n. 16, 631–34).

25. Cho's worksheets try to sidestep the issue by omitting data on how much time those promoted to Area Supervisor had spent as Physical Activities Coordinators. That questionable tactic was doomed to fail. Cho also listed men promoted to Area Supervisor as long ago as 1971, although data on those promotions is totally irrelevant. There was only one promotion of a male (Cho ignores the females who were promoted) during the limitations period: someone who had been with District 22 years (compared with Lyle's 39 years at the time), who had educational credentials comparable to Lyle's— but most important, who had performance evaluations (in a higher position) consistently superior to those Lyle received. That factual presentation would not have demonstrated a prima facie case for Lyle even if she had been a Physical Activities Supervisor and thus eligible for promotion.

as a Female Matron,[26] a position later retitled Female Attendant and later simply Attendant. She was promoted to Head Attendant January 1, 1986, well after she filed her EEOC charge.

There is little doubt that through at least 1978 Shelby was the victim of sex discrimination. As a Female Attendant she was paid substantially less than Male Attendants who performed the same work. However, that pay disparity ended several years before the applicable limitations period.

■ Shelby says she was discriminated against by District's failure to promote her to Head Attendant earlier. Of course she cannot sue for that failure outside the limitations period. And as for the period not barred by limitations, during most of that time District imposed a freeze on promotions to Head Attendant: No one, male or female, was promoted. Shelby now asserts that freeze was discriminatory because it "locked in" the skewed distribution of incumbent Head Attendants. That is of course a major shift from the claim advanced in her complaint—that she was passed over in favor of less well-qualified males. In any case, Shelby has tendered nothing remotely suggesting the freeze was intended to be discriminatory, and its effect on those seeking promotions is sex-neutral.

As for Shelby's claim of having been passed over, by definition she cannot complain because some of the men eventually promoted *at the same time* as she was (or even later) had less seniority.[27] There might perhaps be some other woman, who

also had greater seniority than those men, who was *not* promoted at the same time as Shelby and those men. Such a woman could contend she was harmed by sex discrimination, but Shelby has shown no harm in that respect.

■ That leaves for possible consideration only Juan Torres ("Torres"), who was promoted during 1982 (before the freeze). At that time Torres had slightly less seniority (13½ years compared to Shelby's 15) and less education (8 years compared to Shelby's high school diploma), and his efficiency evaluations were roughly the same as Shelby's. That could perhaps be characterized as meeting the prima facie case requirement, thus triggering the next two stages of the *Burdine* burden-shifting analysis. However, District says it promoted Torres rather than Shelby because he was bilingual and the vacancy was at a park in an Hispanic neighborhood. That is certainly a legitimate nondiscriminatory reason for its decision, and Shelby offers nothing to suggest that reason is a pretext, much less a pretext for discrimination.[28]

As with the first two plaintiffs, defendants have shown there is no disputed issue of material fact as to Shelby's claim, and they are entitled to a judgment as a matter of law against her. Her claim too must be dismissed with prejudice.

### Robinson

■ Robinson has been employed by District since 1967 and has been a Monthly Physical Instructor at Union Park since 1974. Union Park has traditionally been

---

26. That redundant label seems a classic example of bureaucratese—or could it be that District also had an employment category of Male Matrons?

27. Cho's worksheets are thus completely useless to Shelby. With one exception, each male listed was promoted either (1) before the limitations period or (2) at the same time as Shelby or (3) even later.

28. This paragraph has spoken of the Torres-Shelby situation as "perhaps" meeting Shelby's required prima facie threshold. As this Court has commented in earlier opinions in the employment discrimination field, whether a plaintiff satisfies the part of the prima facie test that

requires a showing he or she was "qualified" for the job is often a function of how that concept is defined. If being bilingual were viewed as a necessary qualification for the vacancy involved, Shelby would fail at the threshold, and steps two and three of the *Burdine* analysis would be unnecessary. But carried too far (as for example by treating an employee's poor performance in a job as negating his or her showing of being "qualified," rather than as a nondiscriminatory reason advanced by the employer for its adverse action), that approach would telescope the entire *Burdine* analysis into a single step.

supervised by a Park Supervisor. Maude Watson ("Watson") held that position until she retired in 1986. Robinson frequently filled in for Watson before her retirement, and Robinson sought to be promoted to that position when Watson left.

Instead of considering Robinson's application for the vacancy, District followed its lines of promotion system. That meant it considered only those who were already Playground Supervisors (as already mentioned, Robinson occupied a lower rung on the ladder—Physical Instructor). District promoted a male Playground Supervisor, Richard Boykin ("Boykin"), to the Park Supervisor position.[29]

Complaint ¶ 38 says District "passed over Robinson for promotion, and instead appointed Richard Boykin, a male, to fill the vacancy." That claim has to fail at the outset. On the undisputed facts, Robinson's lack of Playground Supervisor status rendered her unqualified to fill a Park Supervisor vacancy—a fatal gap in her attempt to state a prima facie case of discrimination.

Apparently recognizing that deficiency, Robinson's response to defendants' motion has abandoned her claim that she was discriminated against when Boykin rather than she was made Park Supervisor. Now she asserts she was discriminated against by District's failure to promote her to Playground Supervisor.[30] That simply will not do. Defendants are entitled to know what claim is being advanced against them and to proceed on that basis.

In any event, despite her present attempt to recast her claim as one for denial of promotion to Playground Supervisor, it is quite clear that is not what Robinson wanted. Nor is it even what she now says she wants. Robinson Aff. ¶ 10 quotes from her earlier deposition, asserting that it accurately reflects her current claim:

> I wanted to be promoted to playground supervisor, and after a six-month probation to park supervisor.[31]

In other words, she wanted a two-step promotion. But she has presented no evidence showing anyone was ever given such a two-step promotion from Physical Activities Supervisor, so she has no prima facie case.

As to Robinson as well as the other three plaintiffs, defendants have shown there is no disputed issue of material fact, and they are entitled to a judgment as a matter of law. Accordingly her claim must also be dismissed with prejudice.

### Conclusion

Defendants have shown there is no disputed issue of material fact as to any of the plaintiffs, and defendants are entitled to a judgment as a matter of law in each instance. This action is dismissed with prejudice.

### Appendix

As matters have turned out, any comparison between (1) the qualifications of males who received promotions from District and (2) the qualifications possessed by plaintiffs (with a single exception in Shelby's case) is wholly irrelevant. All plaintiffs' claims (except the one instance involving Shelby)

---

29. Boykin was required to serve a probationary period before the promotion became effective, and he had to remain a Playground Supervisor in the interim. Before his probation was completed, District froze all promotions to Park Supervisor. Hence Boykin has not actually been promoted to Park Supervisor, the title Robinson seeks. Nevertheless he does hold the position she says she should have gotten, so this opinion will treat him as though he had been promoted.

30. It is difficult to divine just what Robinson is claiming. Despite the unequivocal language of her own Complaint ¶ 38, she now cavils at defendants' characterization of her claim as one

for not getting the Union Park promotion (Robinson Aff. ¶ 10), saying that is not her claim at all (presumably her counsel feels District should have known better than to take the Complaint at face value). Yet having thus transmuted her claim, she still spends the bulk of her affidavit attempting to show she was better qualified than Boykin.

31. Even that characterization does not match her contemporaneous communications to District. Her attorney's June 20, 1986 letter demands immediate promotion to Park Supervisor with no probationary period (despite Robinson's false statement to the contrary in her Aff. ¶ 12).

have failed before that point is even reached.

Even so, because each plaintiff relies to some degree on the Cho Aff.Ex.A worksheets, some brief discussion on the subject is in order. Those worksheets list, for each male promoted to the relevant positions, four types of information:

1. length of service with District when promoted;
2. length of service in grade when promoted;
3. education; and
4. efficiency evaluation scores.

Of course, one inherent deficiency of such a listing is the inability to account for intangible considerations that enter into a promotion decision. That, however, would not be a disqualifying flaw preventing plaintiffs' use of the exhibit to establish a prima facie case. For that purpose a plaintiff need show only that her "objective" qualifications were within the range District found acceptable.

There is a more serious problem with the worksheets as submitted, however. They go back to 1979 (and sometimes earlier), well outside the range of any possible limitations period in this action.[1] This Court has therefore not considered promotions before January 1982, the earliest arguable limitation period.

But the most fundamental deficiency in Cho's worksheets is that they include no information at all on the women who were promoted during the relevant periods. Quite obviously, if women as well as men were promoted even though they had less impressive qualifications than plaintiffs had, any inference that District's failure to promote plaintiffs was sex-discriminatory is substantially undercut. Despite that diminished probative value, the fact remains that the prima facie case does not pose an onerous burden, and plaintiffs are entitled to favorable inferences on the current motion. For that reason this Court did review the Cho worksheets where they were potentially relevant.

For example, had Armstrong not been offered the promotions to Park Supervisor that District made available to her, it would have been in order to take into account the fact that Cho's worksheets show several men with substantially less experience with District or less education than Armstrong (or both) who were promoted during the relevant period.[2] That would have sufficed to enable her to survive at the summary judgment stage. As explained in the text of this opinion, however, Armstrong's receipt and refusal of promotion offers render the Cho information irrelevant.

---

**1.** For plaintiffs' Title VII claims, the limitations period in this action began 300 days before filing of EEOC charges (*Gilardi v. Schroeder,* 833 F.2d 1226, 1229–32 (7th Cir.1987)). Armstrong, Lyle and Shelby filed their EEOC charges August 7, 1984, so their Title VII period began in October 1983. Robinson did not file EEOC charges until February 10, 1987, so her Title VII period began in April 1986. As for plaintiffs' Section 1983 claims, *Anton v. Lehpamer,* 787 F.2d 1141 (7th Cir.1986) has announced a two-year statute of limitations. But our Court of Appeals has not been called on to consider the powerful arguments calling for a five-year limitations period, which this Court found wholly persuasive in *Shorters v. City of Chicago,* 617 F.Supp. 661, 662–66 (N.D.Ill.1985). Because the issue has really not been tendered to the Court of Appeals, this Court implies no disrespect in adhering to its own *Shorters* position that a five-year statute of limitations applies. That longer period would result in a limitations period extending back to January 10, 1982 for Armstrong, Lyle and Shelby, and July 31, 1982 for Robinson.

**2.** Indeed, several men were promoted to Park Supervisors after less than one year in the Playground Supervisor position, while Armstrong had been performing well in that position for 19 years. It should be said, however, that even such data is not one-sided. This Court's quick "eyeballing" of the efficiency ratings of those promoted suggests Armstrong would have been toward the bottom of the group.